## EMERGENCY MEDICAL SERVICES

### TRANSPORTATION — JURISDICTION OVER "LITTER VAN" SERVICES

August 2, 1995

*Robert R. Bass, M.D., FACEP*
*Executive Director*
*Maryland Institute for Emergency*
 *Medical Services Systems*

You have requested our opinion whether the Maryland Institute for Emergency Medical Services Systems ("MIEMSS") has jurisdiction over "litter van" services in the territory of the Washington Metropolitan Area Transit Commission ("WMATC" or "Commission").

Several companies are, or have considered, operating "litter van" services in Maryland within the area governed by the WMATC. These services offer transportation of individuals on stretchers. Under one view of the applicable law, litter van services do not fall within the jurisdiction of MIEMSS, but rather are a non-medical service to be regulated solely by the WMATC as transportation for hire. Under another view of the law, litter vans fall within the statutory definition of "ambulance," involve genuine medical considerations, and therefore are within MIEMSS' jurisdiction.

Our opinion is as follows: Litter van service is generally within MIEMSS' jurisdiction, because it is an "ambulance" service as defined by law. However, litter van service within Prince George's and Montgomery Counties is outside MIEMSS' jurisdiction, to the extent that the WMATC exercises jurisdiction over such service within its territory.

# I

## Meaning of "Ambulance" Service

MIEMSS is charged with licensing and regulating all commercial ambulance companies operating in Maryland. §13-1D-15 of the Education ("ED") Article, Maryland Code. Within MIEMSS, the State Office of Commercial Ambulance Licensing and Regulation oversees the licensing and regulation of the commercial ambulance industry. The commercial ambulance regulations are found in Title 14, Subtitle 22 of the Code of Maryland Regulations.

An "ambulance" is defined in ED §13-1D-15(a)(2) as "any vehicle designed and constructed or modified and equipped to be used, maintained, or operated for the transportation of individuals who are sick, injured, wounded or otherwise incapacitated." The definition of ambulance is the same in the regulation, COMAR 14.22.01.01B(7)(a), with an exclusion: Subsection (b) specifically excludes from the definition of ambulance any "vehicle designed and constructed or modified and equipped with a hydraulic lift which is used, maintained or operated, exclusively for transporting, *in wheelchairs*, nonambulatory patients who do not require the use of equipment and trained personnel found in an ambulance." (Emphasis added.)

This definition of "ambulance" surely includes litter vans. To the best of our knowledge, most persons in stretchers are generally "sick, injured, [or] wounded," and they would be uniformly considered "otherwise incapacitated" by virtue of being confined to a stretcher and requiring assistance for mobility.[1] Further, as we understand it, litter vans are outfitted with special restraints, and usually lifts as well; litter vans therefore would fall within the first part of the definition of an ambulance, because they are "designed and constructed or modified and equipped to be used, maintained or operated for the transportation of [patients]."[2]

---

[1] We will refer to such persons in this opinion as "patients."

[2] For the same reasons as set forth in the text, the statutory definition of "ambulance" might well also include "wheelchair vans." However, we need not address that point, because wheelchair vans are currently excluded by regulation from the operative definition. *See* (continued...)

Even if litter vans fall within the apparent definition of "ambulance," it has been suggested, the non-emergency nature of most of the transports by litter van would provide grounds for limiting the scope of the statute to exclude this service. However, the statute itself contains neither an express limitation of this kind nor any implication that it is limited to emergency purposes only.[3]

In addition, nearly all *commercial* ambulance transports are considered non-emergency. This was the case in 1989 as well, when the General Assembly first assigned the regulation of commercial ambulances to MIEMSS. Thus, if the suggested limitation were to be engrafted onto the statutory definition of "ambulance," the limitation would in practical terms repeal the entire regulatory scheme, a result that we are sure the General Assembly did not intend.

In short, we have no difficulty concluding that "litter vans" or "stretcher vans" are within the definition of "ambulance" in ED §13-1D-15 and therefore generally within MIEMSS' jurisdiction.

## II

### Possible Conflict With WMATC Authority

#### A.    *Introduction*

The WMATC was established in 1960 by the Washington Metropolitan Area Transit Regulation Compact, adopted by Maryland, Virginia and the District of Columbia, and approved by Congress. *See generally Alexandria, Bancroft & Washington Transit Co. v. Washington Metropolitan Area Transit Commission*, 323 F.2d 777, 779-80 (4th Cir. 1963). The WMATC is charged with regulating the transportation for hire by any carrier of persons in a specific geographic area, called the Metropolitan District, which

---

[2] (...continued)
COMAR 14.22.01.01B(7)(b).

[3] Words of a statute are to be given their ordinary and plain meaning, absent a manifest contrary intent on the part of the Legislature. *Tatum v. Gigliotti*, 321 Md. 623, 628, 583 A.2d 1062, 1064 (1991).

includes Montgomery and Prince George's Counties. Except for some airport services, WMATC does not regulate transportation that extends outside of the Metropolitan District.

The Compact, which is codified in §10-203 of the Transportation Article, contains an express preemption clause. Under Article XIV of the Compact, all Maryland laws, rules, regulations and orders relating to transportation subject to the Act, other than those related to the inspection of equipment and facilities, are suspended.

## B.    *Nature of Services Approved*

In its role as regulator of transportation of passengers for hire in the Metropolitan District, the WMATC has construed its own authority to cover the nonemergency movement of passengers in wheelchair and litter vans.

Apparently the first case before the WMATC in this area was *In re Ironsides Medical Transportation Corp.*, Order No. 1527 (Mar. 30, 1976). The applicant in that case sought a certificate of public convenience and necessity to transport "disabled, infirm, handicapped, or wheelchair patients and their baggage and attendants" primarily "to and from hospitals, clinics, medical offices, and nursing homes." Order at 1, 2. The Commission noted that the transportation would be rendered "in specially modified van-type equipment," that "the vehicle operators are specially trained emergency medical technicians," and that there was "a need for specialized medical transportation services ... to transport persons between residences and clinics, medical offices, or hospitals for the purpose of receiving medical treatments." Order at 2. Based on these and other factors, the Commission granted the application, but restricted it to transportation of handicapped or disabled passengers.

In the case of *In re Rodwell Buckley, t/a Elrod Transportation Service*, Order No. 1749 (Sept. 16, 1977), the WMATC considered the applications of seventeen entities for approval to operate wheelchair van services in the Metropolitan District. The Commission found that the proposed operations were subject to the jurisdiction conferred by the Compact:

> [T]he prime business purpose of each
> applicant is the derivation of revenue from

> transportation. Unlike ambulance service where the movement of passengers is a mere adjunct to the emergency medical diagnosis and/or treatment administered, here the pure purpose of the service proposed is the movement of passengers between points in the Metropolitan District. Accordingly, the Commission finds that the proposed transportation of non-ambulatory passengers is transportation for hire within the meaning of the above sections of the Compact.

Order at 25.[4] With respect to the vehicles themselves, the Commission found: "Each [wheelchair van] is specially equipped for the proposed transportation services with a ramp, wheelchairs, stabilizing equipment, seat belts, flares, fire extinguishers and first-aid kits." Order at 4. The other sixteen applications considered at that time had similar special equipment, and some of them included plastic "sick bags." *See, e.g.*, Order at 9. In granting some of the applications, the Commission found that the vehicles were "safe and well-equipped for the proposed transportation." Order at 27.

In a later opinion, the Commission apparently expanded the nature of service that it would license, without discussion of the jurisdictional question, although that order was still limited to wheelchair van service. In *Perkins Ambulance and Wheelchair Service, Inc.*, Order No. 2898 (Aug. 21, 1986), the applicant specifically distinguished itself from previously-approved services by stating that its vehicles would be specially equipped to handle emergencies and other extraordinary situations and would be driven by registered emergency medical technicians ("EMT's") Order at 1. This increased level of medical service was described as "particularly useful for kidney patients" ..., "many of whom are non-compliant with fluid restrictions, which can result in shortness of breath thereby necessitating oxygen en route to dialysis." Order at

---

[4] The Commission also found that the proposed wheelchair van operations did not fall within the "taxicab exception" to the WMATC's jurisdiction, for two reasons: because the vehicles would not "accept or solicit" passengers along the public streets and highways; and because the service was not available to the general public, but only to persons who were disabled, handicapped, or otherwise confined to wheelchairs. Order at 26.

2.[5]  The Commission noted that the portable oxygen, trauma kit and cellular telephone on the vehicles were "all for use in emergencies," and that the drivers, "by virtue of their training as EMT's, [are] capable of using the emergency equipment and dealing with non-ambulatory persons in general."  Order at 7.

Since 1991, the Commission's regulatory structure has changed from a "certificate of public convenience and necessity" approach, which required a showing of need for or uniqueness of the proposed service, to a "certificate of authority" model, which focuses on fitness and compliance with regulations and the public interest. Under this new, more competitive approach, many carriers have received approval for wheelchair van service, primarily in the District of Columbia under its Medicaid program.

In *Safai Management Company, Inc., t/a Para-Med Wheelchair Transportation*, the approval notes that the transportation will be for "senior citizens and Medicaid passengers to and from medical facilities."  Order No. 3930 (Apr. 30, 1992). Many other carriers have been granted similar approval with very little description of the service, primarily on the basis of the D.C. Medicaid reimbursement rates as a tariff. *E.g., RDM Enterprises, Inc.*, Order No. 3801 (Aug. 6, 1991); *Abdlhemeed Sidig, t/a TriCare Transportation*, Order No. 4398 (Sept. 29, 1994).  Only one or two carriers currently have separate tariffs for litter or stretcher van service, but others could add this service simply by amending their tariffs.

## C.    Preemption Analysis

### 1.    Preemption principles.

Since the WMATC Compact has the status of a federal as well as a State statute, we must examine whether it conflicts with and takes precedence over the Maryland statute concerning licensure of commercial ambulance services.  We begin that analysis with the

---

[5] In addition, the order notes that "treatment hypotension may occur 20 to 30 minutes after dialysis.  When this occurs patients need oxygen and blood pressure monitoring and, on occasion, must be returned to the facility to be stabilized."  Order at 4.  The order did not explain how a single EMT driver would provide this oxygen and blood pressure monitoring during the return trip from the facility.

general law of preemption, which has been summarized recently by the Supreme Court as follows:

> Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. ... Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by ... Federal Act unless that is the clear and manifest purpose of Congress.
>
> Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose. In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.
>
> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation. Such reasoning is a variant of the familiar principle of *expression unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.

*Cippolone v. Liggett Group, Inc.,* 505 U.S. 516, 112 S.Ct. 2608, 2617-18 (1992) (internal quotation marks, brackets, and citations omitted).

For purposes of preemption analysis, a compact is the same as a federal statute, because "by entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law" of the signatory states in conflict with the compact. *C.T. Hellmuth & Assoc. v. Washington Metropolitan Area Transit Authority*, 414 F. Supp. 408, 409 (D. Md. 1976); 1978-79 Op. Atty. Gen. 165 (Va. Oct. 24, 1978). Moreover, "one party [to an interstate compact] may not enact legislation which would impose burdens upon the compact absent concurrence of the other signatories." *C.T. Hellmuth*, 414 F.Supp. at 409 (citing cases).

### 2.   *Express preemption under the Compact.*

As was true in the *Cippolone* case, the statute we are examining (the WMATC Compact) contains an express preemption provision, so we must look to the intent of Congress and the contracting parties as set forth in that provision. In Article XIV, §2, the Compact provides as follows:

> (a) The applicability of each law, rule, regulation, or order of a signatory relating to transportation subject to this [Compact] shall be suspended on the effective date of this [Compact, which was July 1, 1988].

> (b) The provisions of subsection (a) of this section do not apply to a law of a signatory relating to inspection of equipment and facilities.

The general preemption clause in subsection (a) is very broadly worded. Its term "relating to transportation" surely extends to the separate licensure of ambulances and litter vans by MIEMSS. Hence, MIEMSS' licensure is within the scope of this clause if the licensed transportation is "subject to this [Compact]."

The Compact applies generally to "transportation for hire by any carrier of persons between any points in the Metropolitan District."  Article XI, §1.  As noted above, the WMATC has expressly interpreted nonemergency wheelchair van service to be "transportation for hire" within the meaning of the Compact and presumably has made the same implicit finding for litter van service. Although one could debate that conclusion on factual or policy grounds, the WMATC is certainly within its legal authority to reach that conclusion.  *See Hazen v. Chambers*, 108 F.2d 741 (D.C. Cir. 1939) (ambulances are "passenger vehicles for hire" within meaning of license tax statute; "Sick or well, one who is carried, for hire, through the streets in a vehicle kept and driven by another for such purposes seems to us to be a passenger in the ordinary sense of the word."); *Banner Sightseeing Co. v. WMATC*, 731 F.2d 993, 994 (D.C. Cir. 1984) ("Nothing in the law strips the WMATC of its jurisdiction simply because those providing transportation for hire are also in another business; the law looks only to whether transportation for hire is involved.").

Moreover, since the WMATC is an instrumentality of two states and the District of Columbia and was created with the approval of Congress, and since WMATC has addressed the issue of its own jurisdiction for the closely related service of wheelchair van transports, any arguments that MIEMSS or others may have about the WMATC's jurisdiction should be addressed to the WMATC itself for reasoned reconsideration, rather than declared by one of the signatory states.  *See Baltimore & Annapolis Railroad Co. v. Washington Metropolitan Area Transit Commission*, 642 F.2d 1365, 1370-73 (D.C. Cir. 1980) (WMATC may not overrule jurisdictional decision in effect for 12 years without reasoned analysis). *Cf. D.C. Transit System v. Washington Metropolitan Area Transit Commission*, 366 F.2d 542, 544 (4th Cir. 1966) ("that the Commission is the final interpreter of its own orders is no longer debatable.").[6]  Thus, to the extent that a litter van service is deemed

---

[6] *See also* 366 F.2d at 543 (order of the WMATC affirmed because its ultimate finding upon stipulated facts was "not without support" and "not contrary to law"); *Executive Limousine Service, Inc. v. Goldschmidt*, 628 F.2d 115, 121 (D.C. Cir. 1980) (decisions about the public convenience and necessity in providing transportation service at Dulles Airport must be made by the WMATC, not by the FAA); *Alexandria, Bancroft & Washington Transit Co. v. Washington Metropolitan Area*

(continued...)

by the WMATC to be within its jurisdiction and granted a certificate of authority by the WMATC, its service within points of the Metropolitan District is exempt from regulation by MIEMSS under Article XIV, §2(a) of the Compact.

### 3.  *The "inspection" exception.*

It remains to be considered whether certain Maryland statutes and regulations might be within the exception to preemption, set out in Article XIV, in §2(b) for laws "relating to inspection of equipment and facilities."  At a minimum, this exception permits enforcement of Maryland statutes, such as Titles 22 and 23 of the Maryland Vehicle Law, relating to inspection of equipment and facilities for vehicles in general.

With respect to ambulances, the enabling statute states that MIEMSS's regulations must require that "each ambulance operated by the ambulance service be equipped with adequate equipment and supplies" for certain purposes and that "each ambulance operated by the ambulance service be inspected" in accordance with the Maryland Vehicle Law or certain government or volunteer standards. ED §13-1D-15(c)(2)(i), (iii). The regulations implement these provisions, in much greater detail.[7]

MIEMSS' regulations do relate to inspection of equipment and facilities, but they go much beyond the requirements of the WMATC, which merely determines on a general level whether the applicant is fit, willing, and able to perform the transportation properly.  If these regulations were applicable, a carrier would certainly have to satisfy different and apparently more stringent requirements than those of the WMATC, and in some aspects such dual compliance might be impossible.

---

[6] (...continued)
*Transit Commission*, 323 F.2d 777, 780-81 (4th Cir. 1963) (court must uphold WMATC findings of fact if supported by substantial evidence and may reverse determination of public convenience and necessity only if agency abused its discretion).

[7] For example, a whole chapter of the regulations describes minimum required equipment.  COMAR 14.22.07.

Thus, a broad interpretation of the exception to preemption for "inspection of equipment and facilities" would result in "dual regulatory jurisdiction on the most fundamental matters." *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Commission*, 393 U.S. 186, 189 (1968). As the Supreme Court said in that case, because "Congress was endeavoring to simplify the regulation of transportation by creating WMATC," we "cannot ascribe to Congress a purpose of subjecting [a transportation service] to these two separate masters." 393 U.S. at 193 and 191. Similarly, in addressing the jurisdiction of the WMATC, the D.C. Circuit observed:

> [T]he overall scheme tends to suggest that the exercise of a jurisdiction which might conflict with the jurisdiction of the Commission is to be sharply circumscribed.... [W]hen Congress has provided for a coherent scheme of statutory regulation, the jurisdiction of the designated regulatory agency is to be construed, wherever possible, as exclusive of any arguably parallel jurisdiction.

*Democratic Central Committee v. D.C. Transit System*, 459 F.2d 1178, 1181 (D.C. Cir. 1972).

An interpretation allowing partial application of MIEMSS' regulations to WMACT-approved litter van services poses another difficulty: MIEMSS would have no enforcement mechanism for its regulations. Unlike the registration, titling, and mechanical and emission inspections in the Vehicle Law, each of which can be applied to prevent the doing of some particular act relating to a motor vehicle, MIEMSS' authority is an overall administrative licensing scheme for an ambulance service; this licensing scheme does not have separate enforcement mechanisms for each of its parts. If MIEMSS cannot license a litter van service because the service is approved by WMATC, then MIEMSS would have no effective authority over that service, even for equipment and facilities inspection requirements.

In light of the legal and practical difficulties that could be created by partially overlapping regulation, we conclude that the exception to preemption for laws "relating to inspection of equipment and facilities" was meant to extend primarily to the

Vehicle Law and not to the specific provisions of the MIEMSS statute and regulations for commercial ambulances, which were not in effect in 1960 when the WMATC was formed or in 1988 when the Compact was substantially revised.

# III

## Conclusion

In summary, it is our opinion that MIEMSS may generally regulate litter van service within Maryland, but its authority to regulate such service is preempted to the extent that the WMATC asserts jurisdiction over such service within the Washington Metropolitan District.

J. Joseph Curran, Jr.
*Attorney General*

William F. Howard
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions and Advice*